## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LAMONT E. BOYKINS, | ) | |
|      Petitioner, | ) | |
| | ) | Case No. 11 cv 1623 |
| v. | ) | |
| | ) | Judge Sharon Johnson Coleman |
| DAVE REDNOUR, Warden | ) | |
|      Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Pro se petitioner Lamont Boykins is an inmate in the custody of the Illinois Department of Corrections at the Menard Correctional Center, in Menard, Illinois. Following a 2004 jury trial, petitioner was convicted of first degree murder and sentenced to thirty years incarceration. Boykins has petitioned the court under 28 U.S.C. §2254 for a writ of habeas corpus, challenging his conviction. For the following reasons, the petition is denied.

## I. BACKGROUND

### Trial Court Proceedings

For purposes of a habeas petition, the factual findings of the state appellate court are presumed to be correct. 28 U.S.C. § 2254(e)(1). Accordingly, this Court adopts the appellate court's recitation of the facts and evidence. (*See generally*, Dkt. #12, Ex. A, Order, *People v. Boykins*, No. 2-05-0448 (Ill. App. 2007).)

Petitioner was charged and convicted of first-degree murder of Durrell Gales. The State's theory of the case is that petitioner and Durrell did not get along. Durrell apparently accused petitioner of mistreating Durrell's sister, Antoinette Gales, who was the mother of petitioner's child. According to the State, in the early morning hours of July 19, 2003, petitioner and Antoinette were out socializing separately with their respective friends when they encountered each other in a nightclub and argued. When the nightclub closed, the patrons mingled in the parking lot of a nearby gas station. As several cars pulled out onto Green Bay Road, petitioner and his friend, Tylonne Fain, who were in Antoinette's white Chevrolet Lumina, chased a car in which Anton Thompson, David Usher, and Durrell were occupants. Petitioner allegedly fired several shots from the front passenger seat of the Lumina, killing Durrell, who was in the front passenger seat of the lead car.

*Police Investigation on the Night of the Shooting*

At trial, Officer Dennis Cress testified that, at about 2 a.m. on July 19, 2003, he stepped outside his home and heard approximately six shots fired from somewhere south of his home. At 2:10 a.m., Cress called 911. Officer Michael O'Neill responded to Cress's 911 call. He and other officers searched the area and discovered shell casings on Green Bay Road in the northbound lanes just south of 16th Street.

Christopher Luckie, a firearms and tool mark examiner for the North Illinois Crime Laboratory, opined that all six casings were fired by the same .45 caliber semi-automatic handgun. According to Luckie, such guns usually eject casings to the right. Luckie examined three fired bullets, but he was never asked for an opinion regarding them.

Officer Salvator Cecala testified that, as he was responding to Cress's report of gunshots, he received a report that a shooting victim had arrived at St. Therese Medical Center in Waukegan. Cecala went to the emergency room where he found a young man being treated for a severe gunshot wound to the head. Cecala saw a blue Chevrolet with bullet holes parked near the hospital entrance. Cecala placed crime scene tape around the car, and while he did so, a woman approached and identified herself as Vanessa Thompson. Cecala asked some general questions, and Ms. Thompson responded that her son, Anton, was the driver of the Chevrolet, and David and Durrell, the victim, were passengers.

Without objection from defense counsel, Cecala further testified to what Ms. Thompson told him. Cecala testified that "[Ms. Thompson] says Durrell was having some altercations with –she used a nickname with petitioner, and because of Antoinette, which is Durrell's sister, and they have been having altercations the last few days about something going on between the two of them, their relationship." According to Cecala, Ms. Thompson identified petitioner as "part of the shooting on Green Bay road." At the scene, Cecala told Sergeant William Bell that petitioner was involved in the shooting.

On cross-examination, defense counsel elicited from Cecala that Ms. Thompson obtained her information from her son, Anton. Cecala mentioned Ms. Thompson's identification of petitioner as being involved in the shooting on direct examination, cross-examination, and redirect examination. Defense counsel did not object at any time during Cecala's testimony.

Bell testified that he arrived at the hospital at 2:50 a.m. Durrell was in critical condition with a gunshot wound to his head. Bell also referred the case to the Lake County Major Crimes

Task Force. Bell testified that Cecala told him that petitioner had fired shots at a blue car while driving a white Lumina. Defense counsel initially did not object to Bell's testimony about Cecala's statement, but eventually objected when the prosecutor revisited the topic while questioning Bell. The trial court sustained the single objection on hearsay grounds.

On cross-examination, counsel questioned Bell's knowledge of the source of information regarding petitioner's involvement in the crime. Bell said that he did not know where Cecala had obtained the information. Counsel asked Bell, "You learned later that a person who wasn't even a witness, Candice Moore, told the police [that petitioner] was involved at 3:08 a.m., isn't that true?" Bell responded, "No." Counsel continued to ask Bell whether Candice Moore could have been the person who identified petitioner as being involved. Despite the court's rulings to sustain the State's objection to the questions, defense counsel continued to return to the subject.

Officer Anthony Paulson testified that he arrived at the hospital at 2:36 a.m. Paulson transported Anton to the North Chicago police station. Paulson testified that he did not question Anton during the five-minute ride, but Anton "talked to [Paulson] about what happened with the shooting." The trial court sustained defense counsel's objections to the contents of the conversation.

*Tameka Montgomery and Tewalia Alexander*

Tameka Montgomery and Tewalia Alexander testified to their interaction with petitioner and his friend Tylonne on the night of the shooting. Tameka and Tewalia generally corroborated each other's testimony except where indicated. Tameka, Tewalia, and their friend, Aljeanette Strong, arrived at the nightclub in North Chicago at about 11:50 p.m. Tewalia admitted dancing with petitioner, but she denied causing any disturbance from doing so. When the club closed at 2 a.m., Tameka, Tewalia, Aljeanette, and the other patrons departed. The three women met petitioner in the parking lot where he asked them where they were headed next. The women told petitioner that they were going to Tewalia's parents' house on Greenfield Street in North Chicago.

The women then drove to a nearby gas station, encountered petitioner there and again told him they were going to Greenfield Street. At trial, Tameka did not recall seeing Anton, Durrell, and David at the gas station, but acknowledged her prior inconsistent statement to the police in which she stated that she saw them drive north on Green Bay Road and that petitioner followed shortly thereafter in the same direction. Tameka testified that petitioner left the gas

station in a white car with someone she did not recognize. Tewalia identified Tylonne as the driver of the white car, which headed north on Green Bay Road. The women left the gas station about five minutes after petitioner, turned onto 22nd Street and drove around before arriving at Greenfield Street.

Tameka testified that petitioner and Tylonne arrived at the house on Greenfield a minute after the women. Tameka identified petitioner as the driver and Tylonne as the passenger of the white car. However, later in the trial, Officer Timothy Jonites testified that Tameka told him that petitioner was in the passenger seat and Tylonne was in the driver's seat when the white Lumina arrived at the home on Greenfield. Tewalia testified that petitioner and Tylonne had already arrived and were sitting in the white Lumina when the three women arrived. Tewalia identified Tylonne as the driver and petitioner as the passenger.

The group gathered outside the house for about an hour. Tameka perceived petitioner to be nervous, but noticed nothing particularly unusual. Jonites testified that Tameka told him about a call that prompted petitioner to say, "They are trying to pin a shooting on me. They are saying that I shot my baby's mother's brother." At trial, Tameka did not recall petitioner receiving a cell phone call. Tewalia testified that petitioner received a phone call, and that petitioner said, "They said I just killed that boy" and "that's bullshit."

Tewalia testified that she received a call from petitioner the week after the shooting. Petitioner asked if she remembered dancing with him and his presence outside her home on the night of the shooting, and said that his attorney wished to speak with her. While cross-examining Tameka, defense counsel asked four times whether the police had pressured or threatened her into making a statement they desired. The prosecution objected each time, and the trial court sustained the objections.

*Maronda Dixon, Candice Moore, and Antoinette Gales*

Maronda Dixon and Candice Moore, who are Antoinette's cousins, also testified at trial. On the night of the shooting, Maronda drove Candice and Antoinette to the club and saw petitioner dancing with Tewalia. When petitioner saw Antoinette in the club, he approached her and they had a verbal and physical altercation. Antoinette later danced with another man, petitioner noticed, and they fought again. Maronda, Candice, and Antoinette left the club at about 2 a.m. and again encountered petitioner in the parking lot. Candice testified that she saw Tylonne and petitioner in the white Lumina, with Tylonne in the driver's seat. Tylonne pulled the Lumina

in front of Maronda's car to block them in. At that point, Anton, Durrell, and David pulled up, and Tylonne and petitioner left.

Maronda, Candice, and Antoinette drove Maronda's car to the gas station, which was crowded with people who had just left the club. The women spoke with Anton, Durrell, and David, and agreed to meet at a restaurant north of the gas station. Maronda testified that she saw petitioner and Tylonne in the white Lumina as they drove north on Green Bay road past the gas station. Candice testified that Anton, Durrell, and David left the gas station and drove north on Green Bay Road before the women. Candice saw the Lumina parked in a parking lot across the street from the gas station. Candice testified that the car she was in pulled out directly behind and followed Anton's car going north on Green Bay Road to go to the restaurant. Petitioner and Tylonne pulled out and followed the women. Candice's car subsequently turned east to go another way, and Candice saw petitioner and Tylonne continue to follow directly behind the car carrying Anton, Durrell, and David. Officers Marvin Hodo and Andrew Jones each testified that Candice did not give them this information them the day after the shooting.

Maronda, Candice, and Antoinette drove around for 5 to 10 minutes before arriving at the restaurant. Antoinette received a cell phone call that Durrell had been shot. The women went to St. Therese hospital. At the hospital, Candice held Antoinette's cell phone, which received two calls from petitioner's cell phone. Candice did not speak to the caller.

*Anton Thompson and David Usher*

At the time Durrell was shot, Anton was driving, Durrell was in the front passenger seat, and David was in the rear seat of Anton's blue car. Anton testified that, on the night of the shooting, the three men went to a movie. When it ended at 1:30 a.m., they went to the nightclub and parked in the lot. Anton saw Antoinette arguing with petitioner and heard her say that she was going to get her cousins to "kick [petitioner's] ass." Before Anton could exit his car, the argument ended. Anton, Durrell, and David drove to the nearby gas station where they saw Antoinette, Maronda, and Nicole Lovelace, who were all Anton's cousins. Anton testified he saw the white Lumina in the parking lot near the gas station service doors, with Tylonne in the driver's seat and petitioner in the passenger seat.

Anton testified the he turned north onto Green Bay Road and a line of vehicles followed. He stated that the car carrying Maronda, Candice, and Antoinette pulled out immediately after him, turned east onto Argonne Drive and that several other cars followed the women. As Anton

5

proceeded north, he noticed bright headlights from behind and heard the sound of a bottle hitting his car. Behind him, Anton could see nothing but the headlights. The car tried to pull next to Anton, so he accelerated. Anton testified that gunfire started approximately 1 ½ minutes after he pulled onto Green Bay Road. Anton said he saw a white Lumina turn east onto 14th Street and that it was the same white Lumina in which he had earlier seen Tylonne in the driver's seat and petitioner in the passenger's seat. Anton then observed Durrell slumped next to him, bleeding from the back of his head and drove directly to St. Therese Hospital.

Anton testified that Durrell was unconscious when they arrived at the emergency room entrance. Anton ran inside and summoned help. Anton then called petitioner and asked for Antoinette's cell phone number. Anton told petitioner that Durrell had been shot in the head, but he did not accuse petitioner of shooting. Petitioner provided Antoinette's number and ended the call. Anton called Antoinette.

Anton testified that the police arrived and transferred him and David in separate cars to the Lake County Sheriff's Office. During the ride, Anton told an officer that "just all of a sudden somebody was shooting at us." At that time, Anton did not identify petitioner or Antoinette's car even though he knew both well by sight. At trial, Anton explained his omission as follows:

> "Everything wasn't even hitting me right yet. I didn't realize — I didn't put the puzzle together until [the police] put us in that room and we was locked up for awhile and I just starting [sic] thinking about everything and putting everything together."

On cross-examination, Anton explained that he did not initially tell the officer that the shots came from Antoinette's Lumina because "[he] couldn't think of all that." Anton testified that "everything just started falling into place" while he rested and sat alone in a room at the police station before speaking with the officer again at 8 or 9 a.m. on the following morning. Anton stated that he told the police that petitioner was the shooter because "he was driving a white Chevy Lumina and [petitioner and Durrell] always had bad blood."

Officer Dominic Cappelluti corroborated Anton's testimony. Anton told Cappelluti that the shots were fired from his cousin Antoinette's white Lumina, driven by Tylonne, with petitioner in the front passenger seat. Cappelluti testified that Anton told him that he saw the Lumina in his rearview mirror just after the shooting ended.

David also corroborated Anton's testimony at trial. David recalled that Antoinette spoke to him, Anton, and Durrell in the nightclub parking lot about something petitioner had done.

David also recalled noticing petitioner and Tylonne sitting in a car across the street while his clique mingled in the gas station parking lot.

David testified that, when he, Anton, and Durrell headed north on Green Bay Road, he saw "[his] cousin's Lumina" behind them. David heard something like a bottle hitting the car, he saw a bullet pass through the rear window and hit Durrell, and he ducked down. David heard six or seven shots before the car behind them turned onto 14th Street. He acknowledged that, when the Lumina was behind them, he could not see it because the headlights were too bright. However, he recognized the car when it turned. David positively identified petitioner as the person who was in the white Lumina before the shots were fired.

During cross-examination, David again identified the car as his cousin's white Lumina, and the trial judge halted the proceedings and removed the witness and the jury from the courtroom. The judge stated, "Gentlemen, I've seen signs being sent to the witness from the audience. I need — for the rest of the testimony — to vacate the courtroom," and the spectators were removed.

When cross-examination resumed, David admitted that, while they drove to the hospital, he did not tell Anton that he recognized the Lumina. David testified that he knew who shot at him but was "stunned." During the drive, Anton called his mother. David heard Anton say that Durrell had been shot and that he probably was dead. Anton then called 911. David testified that the shots originated from the Lumina's right side, where he had seen petitioner sitting during the course of the evening. David acknowledged that he did not tell the officers that petitioner and Tylonne were involved until he reached the police station. He explained that, because he "didn't feel like writing," his written statement did not mention that he saw that the shots were fired from the right side of the Lumina.

Officer Gilbert Rivera testified that he interviewed David sometime after 5:40 a.m. on the morning after the shooting. Rivera testified that David told him that the shots were fired from Antoinette's white Lumina and that petitioner was inside the Lumina. On cross-examination, Rivera testified that, at one point in the evening, David said he saw petitioner in the driver's seat of the Lumina. As David's written statement was being prepared, Antoinette advised those talking with the police to leave the station, and David left.

*Police Investigation and Petitioner's Arrest*

Dr. Adrienne Segovia, a Cook County medical examiner, performed an autopsy on Durrell's body on July 21, 2003, two days after his death. Dr. Segovia opined that Durrell's death was caused by a single gunshot wound to the head.

Antonio Gales, the brother of Antoinette and Durrell, testified that, a few days after the shooting, he was at his aunt's home when he received a phone call from petitioner. Petitioner threatened Antonio and his family, saying that "he was not finished and he would kill all of the Ushers." Petitioner also said that "he had a .44 slug" for Antonio. Antonio's aunt called the police, and an officer arrived while Antonio was still on the phone.

Officer Deborah Black testified that she responded to the call. Antonio was agitated and speaking to someone on the phone. He held the phone so Black could hear the caller say that he was not finished and would kill all of the Ushers. Black admitted that she could not identify the voice of the caller and relied on Antonio's identification of petitioner as the caller.

Officer Thomas Durken testified that a few days after the shooting he and other officers executed a search warrant at the American Inn on Sheridan Road in Beach Park. The officers discovered a white Chevrolet Lumina registered to Antoinette. The car contained a dry cleaners receipt in the name of "Fain." Papers in the hotel room bore the names of Antoinette and petitioner. A license plate found in the room was registered to Tylonne.

Officer Eric Weidner testified that he arrested petitioner on an Illinois warrant on August 12, 2003. Weidner found petitioner in a motel near Kenosha, Wisconsin. Petitioner first identified himself as "Anton Gales." While Weidner was in petitioner's room, Antoinette arrived. Petitioner said he was Antoinette's sister, but Antoinette identified petitioner as her boyfriend, "Lamont Smith."[1] Petitioner then revealed his identity.

Officers Jesus Gonzalez and Jonites interviewed petitioner at the Kenosha police station after he agreed to waive his Miranda rights. Petitioner told the officers about his argument with Antoinette at the nightclub. Petitioner said that, after leaving the club between 1:45 and 2 a.m., he encountered Tewalia, Aljeanette, and Tameka in the parking lot and decided to follow them to

---

[1] Detective Greg Lacerra of the Broward County, Florida, Sheriff's Department testified that, on July 25, 2003, he encountered a person behaving suspiciously outside a convenience store. When asked for identification, the person said he was "Lamont Smith." Lacerra searched his computer but found no one with this name. At the person's suggestion, Lacerra called the person's brother, who was purportedly a reverend. The "reverend" verified that he had a brother named Lamont Smith. Lacerra let the person leave. In court, Lacerra identified petitioner as the person who gave him the name of "Lamont Smith."

Greenfield Street. Petitioner said that he was alone in his car when he followed the women. On the way, the women led him past the gas station to the North Chicago Inn where they stopped because one of the women was sick. Once at Greenfield Street, petitioner smoked marijuana until 4 a.m. During that time, he received a phone call from Anton, who requested Antoinette's number and said that Durrell had been shot. Petitioner gave Anton the phone number. Later, Anton called petitioner again and asked whether he had shot Durrell. Petitioner told Anton that he was not involved.

Gonzalez testified that petitioner told him that he went to a motel after leaving Greenfield Street. Petitioner directed "some of his boys" to move the Lumina to the American Inn motel in Zion where he stayed with Antoinette. Petitioner initially denied going to Florida, but he later admitted to vacationing there when told that Detective Lacerra and Tylonne's cousin, Brian Craig, knew he was there. Petitioner admitted to Gonzalez that he gave Lacerra a false name and that his brother verified his false identity over the phone. He also admitted getting a new cell phone and telling Brian's girlfriend to erase his cell phone number from her phone so the police could not track his moves. Petitioner returned from Florida, spent a week in North Chicago and Zion, and then went to Kenosha with Antoinette.

Petitioner told Gonzalez about an altercation he had with Durrell in Zion before the shooting. Petitioner said that he and a friend were at Antoinette's apartment when a group including Durrell arrived and "started to do shit with him." Petitioner directed his friend to start the car because he did not have his guns and did not wish to stay and fight. Petitioner jumped from the balcony and left, but he returned with several friends intending to fight. Durrell, the only person from his group remaining, drew a .38 caliber handgun that petitioner had given him, and said, "You better leave my sister alone." Petitioner believed that Durrell and others had stopped respecting him and wanted him to "go down" because petitioner had become more prosperous and Antoinette had seen the petitioner with one of his other girlfriends. Petitioner thought that those criticizing him for beating Antoinette were wrong because he was a good provider.

Gonzalez and Jonites confronted petitioner with Tewalia's statement that petitioner did not follow her, Tameka, and Aljeanette to the house on Greenfield. Petitioner accused Tewalia of lying, and Gonzalez asked, "Did you shoot Durrell?" Petitioner became irate, stood, waved his arms, and swore at the officers. Then according to Gonzalez, petitioner said "He didn't no longer

want to talk to us, that he wanted a lawyer."

Defense counsel objected to Gonzalez's testimony that petitioner invoked his right to remain silent and consult an attorney. The trial court sustained the objection and instructed the jurors to disregard the answer. The prosecutor resumed by asking, "So at that point he no longer wanted to talk about the facts of the shooting, I take it?" Gonzalez said that was correct. The prosecutor asked about petitioner's demeanor. Gonzalez testified that petitioner was cocky and self-assured until he was confronted with Tewalia's statement. The prosecutor asked, "And it's at that time that he decided not to talk to you anymore, is that right?" Gonzalez agreed.

At one point during cross-examination, defense counsel asked Gonzalez, "And it was at [that] point that petitioner got upset and he said 'I've had enough of this,' right?" Gonzalez answered, "He basically asked for an attorney, yes."

On redirect examination, the prosecutor again asked if petitioner had refused to talk after they asked him about the specifics of the case, and Gonzalez responded, "Yes." The prosecutor asked Gonzalez whether his failure to obtain a written or taped statement was due to petitioner's request for counsel. Defense counsel objected, but the trial court overruled it, concluding that the defense had opened the door to the question by introducing evidence that Gonzalez had not recorded petitioner's statement. The prosecutor twice more mentioned that petitioner invoked his right to remain silent, but defense counsel objected only once, and the objection was sustained.

Officer Rodney Carbajal testified that, on the day after the shooting, he went to the intersection of Green Bay Road and 22nd Street and asked businesses whether they had any videotapes or recordings from security cameras from the previous night. All of the businesses told Carbajal that they had no tapes. Carbajal testified that the manager of the gas station told him that the security camera system was not working that night, but the defense introduced a photograph showing several cameras mounted in various locations at the gas station. Furthermore, Dennis Birnes, a tow truck driver employed by the gas station, testified that "to [his] knowledge," the camera system was functioning properly and that, in fact, Carbajal did not obtain the tape because he failed to follow up on a cashier's instruction to come back later and get the tape from the owner.

*The Prosecution's Closing Argument*

During rebuttal in closing argument, the prosecutor commented on the meaning of "reasonable doubt" as follows:

> "[Defense] Counsel keeps saying reasonable doubt, reasonable doubt, reasonable
> doubt. The State has the burden of proof beyond a reasonable doubt, and that's a
> burden we gladly accept. It doesn't mean all doubt. It means beyond a reasonable
> doubt. And what that means is you have to compile —"

Defense counsel interrupted to object. The trial court sustained the objection and instructed the jury to disregard the comment. The prosecutor resumed by stating, "You have to compile all the evidence, all the statements, and you have to figure out what happened that night." During deliberations, a juror sent a note to the trial judge asking, "Is it possible to obtain the definition of reasonable doubt?" The judge answered, "No." Three hours later, the jury returned a guilty verdict.

## Direct Appeal

Petitioner appealed his judgment of conviction to the Illinois Appellate Court, asserting: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) ineffective assistance of trial counsel for failing to object to hearsay testimony, eliciting hearsay testimony on cross-examination and failing to preserve meritorious claims of error for appellate review; (3) the trial court unconstitutionally restricted defense counsel's cross-examination of Tameka Montgomery; (4) prosecutorial misconduct for referring to petitioner's post-*Miranda* silence in violation of *Doyle v. Ohio*, 426 U.S. 610, 614 (1976), and ineffective assistance of trial counsel for failing to object to the same; (5) the State improperly defined "reasonable doubt" and misrepresented trial testimony during closing arguments; and (6) the mittimus did not accurately reflect the date petitioner was taken into custody. (Dkt. #12, Ex. B, Pet.'s Brief, *People v. Boykins*, No. 2-05-0448.) The state appellate court affirmed, holding that petitioner was proved guilty beyond a reasonable doubt and that any trial errors were harmless beyond a reasonable doubt.[2] (*See generally*, Dkt. #12, Ex. A.) Petitioner's subsequent petition for leave to appeal was denied. (Dkt. #12, Ex. E, PLA, *People v. Boykins*, No. 104549; *People v. Boykins*, 225 Ill. 2d 643, 875 N.E.2d 1115 (Table) (2007).)

## Collateral Proceedings

In June 2008, petitioner filed a pro se post-conviction petition under Illinois's Post-Conviction Hearing Act, 725 ILCS 5/122-1, et seq. Petitioner asserted claims of ineffective assistance of trial counsel for failing to object to the jury instruction regarding assessing the reliability of eyewitness identification testimony, and ineffective assistance of appellate counsel

---

[2] The state appellate court corrected the mittimus to reflect August 12, 2003 custody date. (Dkt. #12, Ex. A, p. 30.)

for failing to argue trial counsel's ineffectiveness on direct appeal. Boykin's petition was summarily dismissed. Petitioner again appealed. The state appellate court affirmed, holding that petitioner was not prejudiced by the allegedly deficient performance of his trial and appellate counsel. (Dkt. #12, Ex. F, Order, *People v. Boykins*, No. 2-08-1238 (Ill. App. 2010).) Petitioner renewed his ineffective assistance claims in a pro se petition for leave to appeal, which was denied. (Dkt. #12, Ex. J, PLA, *People v. Boykins*, No. 111350; *People v. Boykins*, 239 Ill.2d 559, 943 N.E.2d 1102 (Table) (2011).)

§ 2254 Petition

Petitioner filed the instant pro se petition for writ of habeas corpus under 28 U.S.C. § 2254. In his petition, petitioner raises the following claims: (1) the State failed to prove petitioner guilty of first degree murder beyond a reasonable doubt; (2) ineffective assistance of trial counsel for failing to object to hearsay testimony, for eliciting hearsay testimony, and for failing to preserve "meritorious claim for appellate review;" (3) ineffective assistance of trial counsel for failing to object to the prosecutors reference to petitioner's post-*Miranda* silence; (4) ineffective assistance of trial counsel for failing to challenge an improper jury instruction, and ineffective assistance of appellate counsel for failing to raise this issue on direct appeal; (5) the trial court improperly restricted defense counsel's cross-examination Tameka Montgomery regarding her prior inconsistent statement; and (6) the prosecutor improperly used petitioner's post-*Miranda* silence and request for an attorney as evidence of consciousness of guilt. (Dkt. #1, Pet. for Writ of Habeas Corpus, pp. 5-7.)

## II. LEGAL STANDARD

Petitioner filed his petition for a writ of habeas corpus pro se, and the court will therefore construe the petition liberally. *See Gomez v. Randle*, 680 F.3d 859, 864–65 (7th Cir. 2012). Under the Antiterrorism and Effective Death Penalty Act of 1996, to be entitled to a writ of habeas corpus, petitioner must establish that the state court decision he challenges is either "contrary to" or "an unreasonable application of" clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000); *Warren v. Baenen*, 712 F.3d 1090, 1096 (7th Cir. 2013).

As the Supreme Court explained, a state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by the Court on a question of law" or "if the state court confronts facts that are materially

12

indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *See Williams*, 529 U.S. at 405. With respect to the "unreasonable application" prong under § 2254(d)(1), a habeas petitioner must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *See id.* at 407; *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) ("even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable"). Federal courts should deny a habeas corpus petition so long as the state court took the constitutional standard seriously and produced an answer within the range of defensible positions. *Atkins v. Zenk*, 667 F.3d 939, 943–944 (7th Cir. 2012).

### III. PETITIONER'S CLAIMS

#### Claim One

Petitioner asserts that the State failed to prove he is guilty of first-degree murder beyond a reasonable doubt. This Court may only grant habeas relief on an insufficient evidence claim if the petitioner can show that no rational trier of fact, "viewing the evidence in the light most favorable to the prosecution…could have found the essential elements of the crime beyond a reasonable doubt." *U.S. ex rel. Thomas v. Gaetz*, 633 F. Supp. 2d 645, 658 (N.D. Ill. 2009) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

In addressing this issue on the merits, the Illinois Appellate Court reasonably concluded that the evidence was not "unreasonable, improbable or unsatisfactory as to create a reasonable doubt of [petitioner's] guilt," and thus "a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Dkt. #12, Ex. A, pp. 17-19.) Indeed, the court considered 1) testimony that the murder weapon likely ejected shells to the right, suggesting that the shells found on Green Bay Road were fired from the passenger-side of the car; 2) testimony from several witnesses that placed petitioner in the front passenger seat of Antoinette's Lumina on the night of the shooting; 3) testimony that petitioner and Tylonne followed Durrell's car north on Green Bay Road; 4) testimony from Anton and David that shots were fired from the Lumina; 5) evidence of motive and intent, including testimony that petitioner argued with Antoinette that night and had quarreled with her family in the past; 6) testimony from Black that corroborated Antonio's testimony that, after the murder, petitioner declared "he was not finished" and would kill the Gales and Usher families; 7) testimony that petitioner falsely identified himself to a police officer in Florida. (*Id.* at pp. 18-19.)

Petitioner claims the evidence presented at trial was "circumstantial and limited to inconsistent and otherwise dubious, inherently subjective testimony." (Dkt. ##9, 23, Pet.'s Memo. in Support of Pet. for Writ of Habeas Corpus, p. 28.) Petitioner argues that the evidence, while strong, "is conflicting and insufficient to establish [he] was the passenger when the shooting occurred, beyond a reasonable doubt." (*Id.* at p. 31.) While some testimony may have been contradictory, it is the trier of fact's responsibility to "fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Moreover, the *Jackson* inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit. *Herrera v. Collins*, 506 U.S. 390, 402 (1993).

Here, the Illinois Appellate Court's decision is neither contrary to nor an unreasonable application of federal law. Indeed, the court correctly recited and reasonably applied the governing *Jackson* standard to petitioner's sufficiency claim. (*See* Dkt. #12, Ex. A, pp. 17-19.) As such, the Court denies petitioner's habeas petition on this claim.

Claims Two and Four

Petitioner asserts ineffective assistance of trial counsel for failing to object to hearsay testimony, eliciting hearsay testimony on cross-examination, and failing to preserve "meritorious claim for appellate review." Petitioner also asserts trial counsel was ineffective for failing to object to outdated jury instructions and appellate counsel was ineffective for failing to raise the issue on appeal. The Sixth Amendment guarantees criminal defendants assistance of counsel, which the Supreme Court has interpreted to mean the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To succeed on his claims, petitioner must show both that his counsel's performance was deficient, and that he suffered prejudice as a result. *See id.* at 687-88; *Brady v. Pfister*, 711 F.3d 818, 823 (7th Cir. 2013). Deficient performance "requires [a] showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Prejudice requires a showing of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Petitioner asserts that trial counsel rendered ineffective assistance when he failed to object to hearsay testimony from Cecala and Bell regarding Ms. Thompson's statement that petitioner was involved in the shooting. Petitioner alleges trial counsel compounded the error by

eliciting more of the same hearsay testimony on cross examination. The state appellate court fully addressed this issue. (Dkt. #12, Ex. A, pp. 19-22.) The court noted that trial counsel's conduct could not be excused as a matter of trial strategy as there was "no conceivable advantage to be gained by allowing the jury to hear the statement repeatedly." (*Id*. at p. 21.) However, the court found that petitioner "was not prejudiced because the outcome of the trial would not have been different if the hearsay had been excluded" as the evidence to support the conviction was not only sufficient, but overwhelming. (*Id*. at pp. 21-22.) The state appellate court cited testimony from Anton and David that Antoinette's white Lumina was the source of gunshots, testimony from several witnesses that saw petitioner in the car minutes prior to the murder, and Black's testimony that he overhead a phone call from petitioner in which he stated he would kill members of the Gales and Usher families. (Dkt. #12, Ex. A, pp. 21-22.)

Petitioner also challenges trial counsel's failure to object to using an outdated eyewitness identification jury instruction and appellate counsel's failure to raise the issue on direct appeal. Petitioner raised this issue in his post-conviction petition, which the state appellate court addressed and rejected. (Dkt. #12, Ex. F, Order, *People v. Boykins*, No. 2-08-1238 (Ill. App. 2010).) This claim is without merit.

In 2003, prior to petitioner's trial, the eyewitness identification jury instructions were amended to delete each "or" between each factor listed.[3] The committee comment states that "[t]he jury should be instructed on only the factors with any support in the evidence. Other factors should be omitted. Do not use "or" or "and" between the factors where more than one factor is used." Ill. Pattern Jury Instr.-Criminal 3.15 (4th ed.). The state appellate court found that petitioner failed to show that trial or appellate counsel's errors prejudiced him in any way under *Strickland*. (*Id*. at p. 4.) The court again reiterated that overwhelming evidence was presented at trial and further stated that there was "no realistic danger of misidentification by any witness" because each witness that identified petitioner was familiar with him and testified that they saw him in Antoinette's car shortly before the shooting. (*Id*. at p. 5.) This Court agrees that there is no

---

[3] The jury instruction (IPI Crim. 4th 3.15) as read to petitioner's jury, stated: "When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including but not limited to: the following: The opportunity the witness had to view the offender at the time of the offense[;] or The witness' degree of attention at the time of the offense[;] or The witness' earlier description of the offender[;] or The level of certainty shown by the witness when confronting the defendant[;] or The length of time between the offense and the identification confrontation." (Dkt. #112, Ex. F, p. 2.)

reason to think that giving the amended jury instruction would have any effect on the outcome of petitioner's trial. (*See id*. at p. 6.)

The Court finds that the state appellate court's decisions with regard to Claims Two and Four were reasonable and not contrary to the law. Indeed, while petitioner complains the court failed to realize the significance of trial counsel's error, the Seventh Circuit has stated, "weighing the effect of counsel's errors, the court must consider the totality of the evidence.... [A] verdict or conclusion that is overwhelmingly supported by the record is less likely to have been affected by errors than one that is only weakly supported by the record." *Eckstein v. Kingston*, 460 F.3d 844, 848 (7th Cir. 2006). Even if this Court were to find one of either of these errors constituted ineffective assistance of counsel, petitioner has not shown and cannot show prejudice based on any of the alleged errors. Therefore, the petition is denied with respect to these claims.

Claims Three and Six

Petitioner alleges ineffective assistance of trial counsel for failing to object to the prosecution's reference to petitioner's post-*Miranda* silence and further asserts that the prosecution improperly referenced petitioner's post-*Miranda* silence in order to show consciousness of guilt. As stated above, petitioner must satisfy each prong of the *Strickland* test in order to prevail on his ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 687-686.

The prosecution generally cannot use a defendant's post-Miranda-warning silence for impeachment purposes without violating due process. *Doyle v. Ohio*, 426 U.S. 610, 614 (1976). Only "comments that suggest a defendant's silence is evidence of guilt" are prohibited. *Portuondo v. Agard*, 529 U.S. 61, 69 (2000) (quotations omitted). Here, the jury heard eight statements regarding petitioner's post-*Miranda* silence during Gonzales' direct examination, cross-examination and re-redirect examination. Trial counsel objected to only two of the statements, which the trial court sustained and gave curative instructions. In addressing this issue on the merits, the Illinois Appellate Court found that, while reference to petitioner's post-*Miranda* silence was gratuitous, any *Doyle* error was harmless beyond a reasonable doubt. (Dkt. #12, Ex. A, p. 27.)

Before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24 (1967). As the Seventh Circuit recently opined, "[i]f a state court has conducted a harmless-error analysis, the federal court must decide whether that analysis was a reasonable

application of the *Chapman* standard. *Johnson v. Acevedo*, 572 F. 3d 398, 404 (7th Cir. 2009). Here, the court weighed several factors in making its harmlessness determination. (See Dkt. #12, Ex. A, p. 27 (citing *People v. Dameron*, 196 Ill.2d 156, 164 (2001)).) Considerations weighing against a determination of harmlessness included that the trial court could have given curative instructions to all of the statements, rather than only the two to which trial counsel objected. Of significance, however, the court found that references to petitioner's post-Miranda silence did not ask the jury to draw an impermissible inference or emphasize petitioner's consciousness of guilt, but marked a point in time of the investigation. Although the court recognized that the violations were frequent and gratuitous, they comprised a very brief portion of his four-day jury trial. Given this analysis, the state court reasonably concluded that any *Doyle* error was harmless. Additionally, because the error was harmless, petitioner cannot show he was prejudiced under the second prong of *Strickland* and the Court denies habeas relief with respect to these claims.

Claim Five

Finally, petitioner asserts that the trial court judge unconstitutionally restricted defense counsel's cross-examination of Tameka Montgomery. The Sixth Amendment guarantees the right of an accused in a criminal prosecution to be confronted by the witnesses against him, the purpose of which is to "secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974). Trial judges, however, "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Indeed, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).

The state appellate court excused petitioner's procedural default and addressed this issue on the merits. (Dkt. #12, Ex. A, pp. 22-23.) At trial, Tameka testified that she saw petitioner inside and in the parking lot of Flannigans, in the parking lot of North Chicago Inn, the parking lot of the gas station and finally, outside Tewalia's home on Greenfield Road. The prosecution attempted to impeach some of Tameka's testimony with prior inconsistent statements contained within a police report. On cross-examination, defense counsel repeatedly attempted to illicit whether Tameka had been pressured by the police in any way with regards to her pretrial

statements or in court testimony. The trial court sustained the prosecution's objections to each of the questions.

While the state appellate court did not decide whether there was a Confrontation Clause violation, it acknowledged "perhaps the better course would have been to allow defense counsel to develop matters that would have reasonably shown the involuntariness of Tameka's pretrial statement." (Dkt. #12, Ex. A, p. 25.) Nevertheless, the court held that even if the trial court abused its discretion, any error was harmless beyond a reasonable doubt and would not mandate a new trial. (*Id.* at pp. 25-26.) In so holding, the court reasonably applied the *Van Arsdall* factors. Indeed, the Illinois Appellate Court considered that Tameka's testimony was helpful but not particularly important to the prosecution's case, her pretrial statement was cumulative testimony corroborated by Anton and David and, even if it had been discredited, the result would not have been different. A decision in which a state court applies the correct legal rule to the facts of a case cannot be "contrary to" within the meaning of Section 2254(d)(1). *See Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006). Accordingly, claim five of petitioner's habeas fails.

## IV. CONCLUSION

For all the foregoing reasons, the petition for writ of habeas corpus is respectfully denied. Additionally, the Court declines to issue a certificate of appealability as petitioner has failed to make a substantial showing of the denial of a constitutional right. 28 U.S.C. §2253(c)(2). IT IS SO ORDERED.

_____
Date: July 14, 2014

_____
Sharon Johnson Coleman
United States District Judge